# In the United States Court of Federal Claims

No. 11-180C
(Consolidated with Case No. 11-190C)

(Filed:  July 29, 2011)
(Released for Publication:  August 9, 2011)[1]


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*
**JACOBS TECHNOLOGY INC.,**                            \*
                                                      \*
                                   Plaintiff,         \*
                                                      \*
                        v.                            \*
                                                      \*
**THE UNITED STATES**,                                \*
                                                      \*
                                   Defendant,         \*
                             and                      \*
                                                      \*
**IBM GLOBAL BUSINESS SERVICES,**   \*
                                                      \*
                        Defendant-Intervenor.         \*
                                                      \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


*Robert J. Symon*, Bradley Arant Boult Cummings LLP, Washington, D.C., for Jacobs Technology Inc. (Plaintiff).

*K. Elizabeth Witwer*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

*Thomas P. Humphrey*, Crowell & Moring, LLP, Washington, D.C., for IBM Global Business Services (Defendant-Intervenor).

---

[1]  This opinion was originally issued under seal on July 29, 2011, pending a determination among the parties whether to propose redactions of competition-sensitive, proprietary, confidential, or otherwise protected information.  The Court has accepted the parties' proposed redactions, which are indicated herein in the format of three consecutive asterisks within brackets ("[***]").   In addition, the Court has made a few minor clarifications to the original opinion.

## OPINION AND ORDER

**DAMICH**, Judge

Before the Court in this consolidated bid protest case are (1) the motions of Plaintiff[2] IBM Global Business Services ("IBM") to compel discovery and to supplement the administrative record and motion for judgment on the administrative record and (2) cross-motions for judgment on the administrative record by the Defendant United States and Defendant-Intervenor Jacobs Technology Inc. ("Jacobs").

In brief, IBM challenges the Department of Defense United States Special Operations Command's (variously, "USSOCOM's," "agency's," or "Defendant's") initial contract award to Jacobs (a post-award bid protest on the initial procurement) and the agency's subsequent decision to revise the RFP and resolicit the procurement (a pre-award bid protest on the reprocurement). IBM alleges that the agency's decisions in the initial award and in the reprocurement were arbitrary and capricious and in violation of law. Specifically, IBM raises issues related to (1) possible organizational conflicts of interests ("OCIs"), (2) a possible violation of the Procurement Integrity Act ("PIA" or "the Act"), (3) an appearance of impropriety, (4) the technical/management evaluation of proposals, and (5) the past performance evaluation of proposals. For the issues pertaining to alleged OCIs and a PIA violation, IBM seeks discovery and supplementation of the administrative record.

For the reasons explained below, the Court (1) denies IBM's motion to compel discovery and supplement the administrative record, (2) denies as moot IBM's motion for judgment on the administrative record on the issues related to the initial procurement, and (3) grants IBM partial injunctive relief for the reprocurement—enjoining the agency from awarding a contract until the agency conducts additional analysis of organizational conflicts of interests. On all other issues raised by IBM with regard to the reprocurement, the Court denies IBM's motion for judgment on the administrative record and grants the Defendant's and Jacobs' cross-motions on the administrative record.

## I.    BACKGROUND

USSOCOM established a service management and delivery framework—Special Operations Forces Information Technology Enterprise Contracts ("SITEC")—to achieve its vision for a worldwide technology infrastructure. USSOCOM intends to migrate various information technology services from the existing Enterprise Information Technology Contract ("EITC") to new service providers acquired through SITEC. Administrative Record ("AR") 804. The Information Technology Service Management ("ITSM") contract, at issue in this case, is the first of a series of service contracts to be awarded as part of SITEC. AR 803, 805. The ITSM service area provides the overall management of the information technology service providers

---

[2] The two cases have been consolidated under the caption of the first-filed case, an action by Jacobs Technology Inc. to enjoin corrective action related to the initial procurement award. Notwithstanding the caption, the references used herein as to the Plaintiff, the Defendant, and the Defendant-Intervenor reflect the subsequent complaint filed by IBM.

and the integration of USSOCOM's worldwide information technology infrastructure and operations. AR 803.

### A.     USSOCOM's Request for Proposals

On May 27, 2010, USSOCOM issued a final request for proposals ("RFP") for ITSM services. AR 700. The RFP stated that the ITSM Contractor would be expected to support the Information Technology Management Office in (1) enterprise-level standardized information technology processes and methodologies, (2) the transition from the EITC to the new service providers, and (3) the overall integration and coordination of the service delivery activities provided by various service providers. AR 804.

The RFP set forth the specific criteria that USSOCOM would use in the evaluation of offerors' proposals and in its best value source selection decision. The RFP stated that the agency would first evaluate proposals under several pass/fail qualifying criteria and then evaluate the proposals based on technical/management, past performance, and cost/price factors. AR 1472.

For the Technical/Management Factor (RFP Section M.1.4), the RFP advised that:

> [The agency would] evaluate the Offeror's overall approach and expressed capabilities for providing the IT service management and integration services across all IT Service Areas, as well as its ability to manage the day-to-day operations delivery and support the IT services environment for each individual IT Service Area. Evaluation of this factor shall focus on the strengths, weaknesses, and risks of the Offeror's proposal, as well as demonstrated historical capability of engagements of similar size and complexity.

AR 1474. The RFP stated that the agency would assign an overall rating for technical/management of outstanding, good, acceptable, or unacceptable based on a roll-up of nine subfactors. AR 1473.

For the Past Performance Factor (RFP Section M.1.5), the RFP stated that:

> [The agency would] consider[ ] the Offeror's demonstrated record of performance in providing services and products that meet users' needs and in past performance regarding subcontracting. The [ ] Past Performance evaluation [would] focus on how well the contractor performed or is performing the same or similar type of work under other Government or commercial contracts…. The [agency would ] conduct an in-depth review and evaluation of all past performance data obtained to determine how closely the work performed under those efforts relates to the current requirement.

AR 1475-76.

The RFP advised that the past performance assessment would reflect the agency's overall level of confidence in the offeror's ability to successfully perform the required effort. The

agency would determine whether it has high confidence, satisfactory confidence, limited confidence, or unknown confidence in the offeror's ability.  The confidence rating in turn would be based on the offeror's performance evaluations for current and relevant present and past performance.  The agency would assign a performance rating of exceptional, very good, satisfactory, or unsatisfactory to each evaluation.

For the Cost/Price Factor, the RFP stated that the agency would evaluate the offerors' proposals based on Probable Cost and assess for reasonableness under Federal Acquisition Regulations ("FAR").  AR 1476.  The RFP explained that Probable Cost would be determined by USSOCOM in part based on the offerors' proposed unit prices and the agency's estimate of the quantity of users.  *Id.*  The RFP advised that Probable Cost represented the agency's "best estimate of the cost of any contract that is most likely to result from the Offeror's proposal."  *Id.*

One component of Probable Cost was the cost associated with information technology service desk support.  Pursuant to the RFP, offerors were required to provide prices—per month per user — for three different levels of service (bronze, silver and gold levels) as part of the service desk support requirement.  For the initial procurement, the RFP provided annual maximum quantities for each service level.  USSOCOM provided historical information only for the total number of users on a monthly basis.  The agency indicated that offerors were expected to "use that data along with their experience with similar efforts to develop an estimate of the effort required for the service desk effort."  AR 1038.  The agency also stated that offerors were only to provide unit prices for each level; the agency would evaluate offerors' costs based on its estimate of the number of monthly users by level.

Pursuant to regulatory requirements under FAR 9.504(a), during the development of the acquisition plan, the Contracting Officer conducted an OCI analysis.  The analysis focused on whether contractors and subcontractors of three existing contracts, namely, (1) the Global Battlestaff and Program Support  ("GBPS") contract, (2) the Acquisition, Logistics, Management and Business Operations ("ALMBOS") contract (predecessor to GBPS), and (3) the Enterprise Information Technology Contract ("EITC"), should be precluded  from bidding on SITEC contracts, including the ITSM contract at issue here.  Jacobs was a contractor on the GBPS and ALMBOS contracts and a subcontractor to L-3 Communications Corporation ("L-3") on the EITC contract.

The Contracting Officer determined that there were no OCIs regarding these contractors and subcontractors and their involvement in these contracts.  AR 42-43.  After the offerors submitted their proposals and the agency completed the Competitive Range Determination, the Contracting Officer conducted a second OCI analysis based on concerns raised by the source selection authority (SSA).  AR 44.  The Contracting Officer requested that legal counsel perform an OCI analysis.  *Id.*  This second OCI assessment also indicated that measures were in place to avoid OCIs and that there were no OCI issues that required mitigation or that would preclude any incumbent contractors from bidding on the procurement.  *See* AR 4275-77.

## B. The Initial Award

USSOCOM received five offers in response to the RFP and evaluated each based on technical/management, past performance, and cost/price factors. USSOCOM assigned Jacobs a "good" technical/management rating and a "high confidence" rating for past performance. AR 4281. For IBM, USSOCOM assigned the firm [***]. *Id.* The Probable Cost for IBM was [***] compared to $141,718,797 for Jacobs. AR 4282.

Based on the evaluation of the offerors' proposals and the source selection decision, USSOCOM determined that Jacobs' offer represented the best value and awarded the ITSM contract to Jacobs. AR 4284.

## C. IBM's Bid Protest Before the GAO

IBM filed a bid protest with the United States Government Accountability Office ("GAO") challenging the award to Jacobs on numerous grounds, and the agency stayed performance of the contract. Pertinent to the case at bar, IBM alleged that Jacobs had an "unequal access to information" OCI or there was a violation of the Procurement Integrity Act (pertaining to service desk user information), and that USSOCOM failed to mitigate or avoid Jacobs' actual OCIs and failed to identify Jacobs' other potential OCIs. Additionally, IBM alleged that USSOCOM's technical/management and past performance evaluations were flawed.

The GAO sustained two grounds of IBM's bid protest, concluding (1) that the agency evaluated proposals using an unstated evaluation factor and (2) that the offerors did not have adequate information to compete on a relatively equal basis. The GAO recommended that the agency issue an amendment to the solicitation and provide all offerors the opportunity to submit revised proposals. AR 33853.

The GAO's determination that the offerors did not have adequate information to compete on a relatively equal basis pertained to the service desk user requirements that would be used for cost evaluation purposes. IBM alleged that Jacobs, the incumbent contractor for USSOCOM's service desk, had information related to service desk user requirements that provided it an improper competitive advantage. The GAO specifically recommended that the RFP be amended to include information on the service desk user requirements that would be used for cost evaluation purposes. *Id.* The GAO's recommendation that the agency provide the information to all offerors was based on a determination that Jacobs had information regarding service desk user requirements that gave it an unfair competitive advantage.

Despite the resemblance of this determination to an unequal access to information OCI, the GAO did not expressly state that it was an OCI, although IBM had alleged that it was. Yet, under the heading of "OCI" in its opinion, the GAO referred again to the improper access to information relating to service desk user information. Most of the OCI section of the GAO's opinion, however, was devoted to IBM's allegations that Jacobs had other OCIs as a result of its performance on the ALMBOS, GBPS, and the EITC contracts, and IBM's allegation that USSOCOM's OCI analysis was inadequate. *See* AR 33850-53. Somewhat puzzlingly in light of the service desk information recommendation, the GAO concluded that there was nothing in the

record to suggest (1) that Jacobs had an OCI,[3] (2) that the agency failed to undertake a reasonable OCI analysis, or (3) that Jacobs should be excluded from the procurement on OCI grounds.  AR 33851-53.

In addition to the ambiguity about the service desk issue as an OCI, the GAO did not discuss the additional grounds that IBM raised, which included the existence of a PIA violation and flaws in the technical/management evaluation and the past performance assessment.  IBM has included these issues in its claims before this Court as they relate to both the initial procurement and the reprocurement.

### D.    The Reprocurement

USSOCOM adopted the GAO's recommendations, amended the solicitation, and requested offerors to submit revised proposals.

Unrelated to GAO's recommendation, USSOCOM (1) revised the technical/management evaluation by making the use of "demonstrated historical capability" optional in the evaluation and (2) decided that it would not re-evaluate offerors' past performance in the reprocurement.  In addition, for the reprocurement, USSOCOM decided not to conduct further OCI analysis or initiate procedures in response to IBM's alleged PIA violation.[4]  As discussed herein, IBM claims that these additional decisions were arbitrary and capricious or otherwise not in accordance with law.

USSOCOM has proceeded with the reprocurement and has agreed to extend the stay of contract award until August 1, 2011, to allow the Court to address the remaining issues in this case.

### E.    Procedural History

On March 21, 2011, Jacobs filed a bid protest in this court challenging the agency's decision to follow the GAO's recommendations.[5]  IBM filed its bid protest complaint on March 25, 2011, subsequently amended on March 28, 2011, challenging both the initial procurement and challenging the amended solicitation that the agency issued in response to the GAO's recommendations. On motion by the parties, the Court consolidated the bid protest cases of Jacobs (Case No. 11-180C) and IBM (Case No. 11-190C).

On April 6, 2011, IBM filed a Motion to Compel Discovery from Jacobs and to Supplement the Administrative Record ("IBM's Mot. Compel").  IBM seeks to discover documents from Jacobs related to two of IBM's allegations in its bid protest:  (1) that Jacobs

---

[3]  *See infra* Part IV(A)(2)(a) regarding the service desk user quantities.

[4]  The Court previously determined that the agency effectively had decided not to conduct further OCI analysis or a PIA investigation.  *Jacobs Tech. Inc. v. United States*, 2011 WL 2215018, at *3, *4 (Fed. Cl. May 27, 2011). Therefore, throughout the opinion a decision is imputed to the agency.

[5]  Each plaintiff is also a defendant-intervenor in the other plaintiff's case.

violated the Procurement Integrity Act and (2) that Jacobs had further OCIs.  IBM requests that the motion to compel discovery be granted and that, based on the results of discovery, the administrative record be supplemented accordingly.

On April 11, 2011, IBM filed a Motion for Judgment on the Administrative Record on its claims pertaining to the initial procurement and the reprocurement.[6]  As to the initial procurement, IBM alleges that USSOCOM's contract award to Jacobs was improper on other grounds (e.g., OCIs, a PIA violation, and flawed evaluations of offerors' proposals), not just the grounds the GAO sustained in its decision.[7]  As to the reprocurement, IBM challenges USSOCOM's revised RFP as unlawful and improper because USSOCOM did not take sufficient corrective actions (i.e., address issues raised by IBM in its GAO bid protest), and the additional changes USSOCOM made to the RFP unrelated to the GAO's recommendations were arbitrary and capricious.  IBM also requests the Court to find that Jacobs has an OCI and has violated the PIA with the result that it should be excluded from the reprocurement.

After various other motions were filed and adjudged by this Court,[8] the Court held oral argument on June 27, 2011, to address questions related to three of IBM's issues:  (1) existence of OCIs and the agency's OCI analysis, (2) a possible violation of the PIA, and (3) the appearance of impropriety.

---

[6]  The relevant filings in the case docket are:

(1)  Plaintiff  IBM's First Amended Complaint for Declaratory and Injunctive Relief ("IBM's Am. Compl.")(March 28, 2011)

(2)  Plaintiff IBM's Motion for Judgment on the Administrative Record ("IBM's Mot. JAR")(April 11, 2011)

(3)  Plaintiff IBM's Memorandum of Points and Authorities in Support of its Motion for Judgment on the Administrative Record)("IBM's Br. Mot. JAR")(April 11, 2011)

(4)  Defendant's Motion to Dismiss, and, in the Alternative, Cross-Motion for Judgment upon the Administrative Record and Response to Plaintiffs' Motions for Judgment on the Administrative Record ("Def.'s Resp. & Cross-Motion" )(April 25, 2011)

(5)  Defendant-Intervenor Jacobs Technology Inc's Opposition to IBM's Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record ("Jacobs' Resp. & Cross-Motion")(April 25, 2011)

(6)  Plaintiff IBM's Reply in Support of its Motion for Judgment on the Administrative Record in the IBM Action, and Opposition to Defendant's and Jacobs' Cross-Motions for Judgment on the Administrative Record ("IBM's Resp. & Reply")(May 2, 2011)

(7)  Defendant's Reply in Support of Its Cross-Motion for Judgment Upon the Administrative Record in the Protest Brought by IBM Global Business Services (11-190C) ("Def.'s Reply")(May 9, 2011)

(8)  Defendant-Intervenor Jacobs Technology Inc.'s Reply in Support of its Cross-Motion for Judgment on the Administrative Record in the Jacobs Action ("Jacobs' Reply")(May 9, 2011)

[7]  Although GAO sustained IBM's bid protest on the initial procurement, IBM filed claims in this court because Jacobs' had filed a bid protest requesting that the Court reinstate the initial contract award.

[8]  The Court has issued three decisions in this case:

(1)  Denial of Defendant's Motion to Dismiss Jacobs' Complaint, *Jacobs Tech. Inc. v. United States*, Nos. 11-180C, 11-190C, 2011 WL 2044581 (Fed. Cl. May 16, 2011)

(2)  Denial of Defendant's Motion to Dismiss IBM's Complaint, *Jacobs Tech. Inc. v. United States*, Nos. 11-180C, 11-190C, 2011 WL 2215018 (Fed. Cl. May 27, 2011)

(3)  Denial of Jacobs' Motion for Judgment on the Administrative Record, *Jacobs Tech. Inc. v. United States*, Nos. 11-180C, 11-190C, 2011 WL 2516416 (Fed. Cl. June 8, 2011)

## II.   JURISDICTION AND STANDARD OF REVIEW

### A.   Jurisdiction

The Court of Federal Claims has jurisdiction under the Tucker Act "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  For the reprocurement, which is the focus of the Court at this stage of the case,[9] the Plaintiff's complaint is a pre-award bid protest and IBM is objecting to the revised solicitation and alleging violations of procurement statutes and regulations.  Thus, IBM's complaint falls within the jurisdiction of this Court.

The Court previously determined that IBM's claims relating to the reprocurement were ripe for review, and that IBM has standing.  *Jacobs,* 2011 WL 2215018.  Regarding standing, the Court determined that IBM has a direct economic interest and has demonstrated a non-trivial competitive injury.  The Court concluded that, if the issues raised by IBM were not addressed, then IBM would be at a competitive disadvantage.  *Id.* at *6.  For example, if Jacobs has nonpublic information that has assisted it in preparing its proposal, then IBM would not be competing on a level playing field.  *Id.* at *5-6.

### B.   Legal Standards

The Court's focus is on the reprocurement and the various alleged flaws in it that IBM has pressed upon the Court.  Thus, the Court's inquiry is on the rationality of the agency's actions or inactions regarding the reprocurement.  The GAO decision is only relevant insofar as the GAO has made recommendations regarding the reprocurement and the agency has followed them.[10]  The Court may then examine the rationality of the GAO's recommendations, and, if it finds them to be rational, it follows that the agency's compliance with the GAO's recommendations has a rational basis.  *See Honeywell, Inc. v. United States,* 870 F.2d 644, 647 (Fed. Cir. 1989). Where the GAO has not made a recommendation or where the GAO has not even opined on a matter, the Court obviously has nothing to examine.

In a bid protest action, a court reviews an agency's procurement actions under the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. § 706 (2006);  28 U.S.C. § 1491(b)(4); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Under the APA, a court determines, based on a review of the record, whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Thus, an agency's procurement

---

[9]  IBM's claims with regard to the initial procurement are addressed in Part III(A).

[10]  GAO's findings on the initial procurement are relevant in assessing the rationality of the agency's decisions in the reprocurement because they are part of the record that was before the agency as it was faced with decisions in the reprocurement.

decision may be set aside if the decision lacked a rational basis or the agency violated a procurement regulation or procedure. *Impresa*, 238 F.3d at 1332.

When evaluating challenges to agency decisions for lack of a rational basis, courts recognize that contracting officers are entitled to broad discretion in the procurement process. *Impresa*, 238 F.3d at 1332. Accordingly, courts apply a "highly deferential" standard. *CHE Consulting, Inc. v. United States,* 552 F.3d 1351, 1354 (Fed. Cir. 2008) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). Under that standard, courts determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting *Impresa*, 238 F.3d at 1333). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell*, 870 F.2d at 648 (citation omitted). Thus, courts should "sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" *Advanced Data Concepts*, 216 F.3d at 1058.

A court should set aside an agency's decision as arbitrary and capricious if the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc. v. United States*, 586 F.3d 1372,1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Thus, "the disappointed bidder bears a heavy burden of showing that the agency's procurement decision had no rational basis." *Impresa*, 238 F.3d at 1332-33(citation omitted).

If the plaintiff alleges that the agency's decision is a violation of regulation or procedure, the plaintiff must demonstrate "a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.*, 564 F.3d at 1381 (quoting *Impresa*, 238 F.3d at 1333).

The focal point of the court's review of an agency's decision is the administrative record provided by the agency. *See id.* at 1379-80 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44(1985)). Where the parties have filed cross-motions for judgment on the administrative record, as here, Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States,* 404 F.3d 1346, 1356 (Fed. Cir. 2005). Unlike summary judgment standards, genuine issues of material fact do not preclude a judgment on the administrative record. *See id.* at 1355-56. Questions of fact are resolved by reference to the administrative record. *Id.* at 1356.

If a court concludes on the merits that an agency's decision was arbitrary and capricious or in violation of the law, the court proceeds to determine if the plaintiff is prejudiced by the agency's action. *Id.* at 1351. This second prejudice determination is based on the same standards as the initial prejudice determination used for the purposes of determining if the plaintiff has standing. *L-3 Commc'ns Corp. v. United States*, 2011 WL 1957681 (Fed. Cl. May 20, 2011). "The difference between the two is that the prejudice determination for purposes of

standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true." *Id.* (citing *USfalcon v. United States*, 92 Fed. Cl. 436, 450 (2010)).  For the reprocurement—a pre-award bid protest—this Court adopts the *Weeks Marine* standard for prejudice on the merits, which the Court adopted for purposes of standing in this case.  *See Jacobs*, 2011 WL 2215018, at *5-6. Under *Weeks Marine*, the bid protestor must demonstrate a "non-trivial competitive injury which can be addressed by judicial relief."  *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1362 (Fed. Cir. 2009).

If a court determines that the plaintiff is prejudiced by the agency's action, the court then addresses whether injunctive relief is warranted.  For injunctive relief, in addition to determining the plaintiff's success on the merits, the court weighs the plaintiff's irreparable harm if the court withholds such relief, the balance of hardships to the respective parties, and the public interest in granting injunctive relief.  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

## III.   PRELIMINARY MATTERS

### A.   IBM's Motion With Regard to the Initial Procurement Is Denied As Moot.

As stated above, IBM's bid protest challenges the initial procurement and the reprocurement.  IBM's claims regarding issues with the initial procurement is no longer relevant because the Court has already denied Jacobs' motion seeking reinstatement of the award.  *Jacobs Tech. Inc. v. United States*, Nos. 11-180C, 11-190C, 2011 WL 2516416 (Fed. Cl. June 8, 2011). Therefore, the Court denies as moot IBM's motion for judgment on the administrative record on the issues associated with the initial procurement.

### B.   IBM's Motion to Compel Discovery and to Supplement the Administrative Record Is Denied.

The essence of IBM's Motion to Compel Discovery from Jacobs and to Supplement the Administrative Record is to discover information from Jacobs to determine if there was a violation of the PIA or if there was an OCI.  For example, IBM seeks to establish that Jacobs violated the PIA by improperly obtaining service desk user information.[11]   IBM argues that discovery of PIA violations and OCIs should be compelled because IBM has a good faith basis for its allegations, the information IBM seeks by its nature would not be found in the agency record, and that discovery will facilitate meaningful judicial review.   IBM's Mot. Compel 8-17.

---

[11]   IBM requests discovery on how Jacobs determined its pricing on the presumption that Jacobs improperly obtained information from USSOCOM on how the agency planned to evaluate costs.  To that end, IBM requests that Jacobs provide documents related to any communication with USSOCOM regarding the agency's price evaluation plans (including, but not limited to, the number of service desk support users).  IBM's Mot. Compel 10-11.  IBM states that the information to be obtained from discovery would be similar to the information that the agency would have obtained if it had conducted a PIA investigation.  IBM's Mot. Compel 18.  Presumably, the documents that IBM requests would establish (or not establish) a PIA violation—that Jacobs knowingly obtained information from the agency regarding the quantities of users the agency planned to use for evaluation purposes.

According to IBM, supplementation of the record (from discovery) is warranted because, inter alia, discovery will likely yield evidence of a PIA violation (which would have been part of the record if the agency had conducted an investigation) and because effective judicial review will not be possible without supplementation.   IBM's Mot. Compel 17-20.

In light of the Court's determination *infra* that the agency—not the Court or IBM—is charged with conducting the OCI analysis and a PIA investigation (if warranted), IBM's motion is inappropriate.  *See* Parts IV(A)(3), (B)(4).  Whereas the issues in the initial procurement were whether there was an OCI or a PIA violation, the Court views OCI and PIA issues in the context of the reprocurement to be whether further OCI analysis or a PIA investigation is required prior to contract award.  For the reprocurement, in the absence of agency analysis and investigation, the Court's role is to determine whether the agency's failure to conduct further OCI analysis or a PIA investigation was arbitrary and capricious in light of the GAO's decision and IBM's allegations and in the case of PIA violations, in light of IBM's notification of potential violations.  Thus, for the reprocurement, the Court determines that discovery and supplementation of the record are not warranted to determine whether there is an OCI or a PIA violation.

In light of the above, the Court denies IBM's motion to compel and to supplement the administrative record.

### C.   The Contracting Officer's Statements Are Contemporaneous Evidence for the Reprocurement.

The parties dispute whether the Court may use the Contracting Officer's statements[12] in the GAO bid protest on the initial procurement for the Court's review of the reprocurement. IBM argues that the Contracting Officer's statements are *post hoc* rationalizations because they were developed in the course of the bid protest before the GAO.  IBM's Reply & Resp. 17.  The Defendant, however, contends that the statements are part of the contemporaneous record and not *post hoc* explanations for the reprocurement for the purposes of (1) determining whether there was a possible PIA violation by Jacobs, (2) explaining the Contracting Officer's OCI analysis, and (3) evaluating the rationality of the agency's actions.  Def.'s Reply 4 n.3, 9.

The Supreme Court has held that *post hoc* rationalizations that are part of the administrative record should not be relied upon as the basis for reviewing an agency's decision. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 419 (1971); *In re Sang Su Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002).  A contracting officer's statement developed in response to a bid protest before the GAO is clearly a *post hoc* rationalization as it relates to that bid protest.  But when the decisions at issue relate to an agency's reprocurement, as here, contracting officer's statements pertaining to the initial procurement may contain information that reasonably informed, and were the basis of, the agency's reprocurement decisions.  *See Impresa*, 238 F.3d at 1339.  Thus, the Court considers

---

[12]   There are two statements of the Contracting Officer in the Administrative Record – one in response to IBM's bid protest as filed (AR Tab 2) and one in response to IBM's supplemental bid protest (AR Tab 71).

the Contracting Officer's statements made during the bid protest on the initial procurement as contemporaneous evidence for the agency's reprocurement decisions.

Furthermore, the United States Court of Appeals for the Federal Circuit has recognized situations, although rare, where the Court may rely on declarations of contracting officers for purposes of determining whether the agency's action at issue in the bid protest was arbitrary and capricious. *Id.* at 1338-39. In particular, where the contracting officer is not required to take action or document or explain a decision, as in the case at bar, the court needs to know what information the contracting officer considered and "on what basis he made the determination" to determine if the decision had a rational basis. *See id* at 1339.[13]

Pertinent to this case, the regulations governing OCIs and PIA violations only require that the contracting officer take action or document a determination upon certain circumstances. For OCIs, the regulations do not require the contracting officer to document the analysis unless the OCIs are significant. *See* FAR 9.504(c); 9.506(b). For violations or possible violations of the PIA, if a contracting officer receives information that a person unlawfully or improperly obtained source selection information, the contracting officer must document his/her determination of whether there is any impact on the procurement. *See* FAR 3.104-3(b); 3.104-7(a). The Court infers from the regulations that if the agency, as here, determines that a PIA violation is not possible, then the agency need not necessarily document its determination. However, in evaluating the rationality of USSOCOM's OCI and PIA decisions, the Court requires an understanding of the Contracting Officer's determination —what information the Contracting Officer considered and the basis for his decision. Thus, the Contracting Officer's statements may provide the record evidence that explains the basis for his decisions.

For IBM's issues challenging the agency's evaluations (technical/management and past performance) of offerors' proposals, the Contracting Officer's statements during the GAO bid protest on the initial procurement help explain the rationale for his decisions in the reprocurement.

In sum, the Court determines that the Contracting Officer's statements relating to issues raised in the bid protest on the initial procurement are contemporaneous evidence which may help explain the basis for the agency's decisions in the reprocurement. Therefore, the Court may rely on the statements in judging the rationality of the agency's decisions.

## IV.   DISCUSSION

IBM challenges USSOCOM's decisions in connection with the reprocurement alleging that the agency's decisions were arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Specifically, IBM calls into question five issues with the procurement:

---

[13]  In *Impresa*, the decision at issue was the responsibility determination where the contracting officer was not required to explain his decision. The court found that "[i]n order to answer the question of whether there was a lack of rational basis for the contracting officer's decision, we must know: (1) whether the contracting officer, as required by [federal regulation], possessed or obtained information sufficient to decide the integrity and business issue, including the issue of control, before making a determination of responsibility; and (2) on what basis he made the responsibility determination." *Id.* at 1339.

(1) organizational conflicts of interests (OCIs), (2) a possible violation of the Procurement Integrity Act (PIA), (3) an appearance of impropriety, (4) an improper modification of the technical/management evaluation approach, and (5) a flawed evaluation of Jacobs' past performance.  In addition to a declaratory judgment that the agency's decisions related to these matters were arbitrary and capricious, IBM seeks injunctive relief directing the agency (1) to exclude Jacobs from the reprocurement because of OCIs, a PIA violation, and an appearance of impropriety, (2) to revise the technical/management evaluation approach in the RFP to reflect the "demonstrated historical capability of engagements of similar size and complexity," (3) to re-evaluate Jacobs' past performance as part of the reprocurement (if Jacobs is not excluded), and (4) to evaluate proposals in accordance with the RFP and applicable procurement law and regulations.

The Court discusses the five issues raised by IBM *seriatim*.

## A.    Organizational Conflicts of Interests ("OCIs")

IBM alleges that, in light of its GAO bid protest and the GAO's decision, USSOCOM's failure to conduct further analysis of Jacobs' potential OCIs was arbitrary and capricious and in violation of law and, therefore, Jacobs should be excluded from the reprocurement.  IBM's Br. Mot. JAR 33-34.  The Defendant argues that USSOCOM's decision to allow Jacobs to compete in the reprocurement was rational.  The Defendant stresses that the Contracting Officer complied with federal regulations pertaining to OCIs, found no significant OCIs, and undertook significant efforts to prevent OCIs early in the procurement process.  See Def.'s Resp. & Cross-Motion 53-58.

As explained below, the Court agrees with IBM that it was arbitrary and capricious for the agency not to pursue additional OCI analysis in the reprocurement in light of the issues raised in IBM's bid protest and the findings and conclusions in the GAO's decision on the initial procurement.  Specifically, the Court concludes that the GAO's decision regarding desk service levels was effectively a determination that an unequal access to information OCI existed.  Faced with the GAO's decision and comments on the desk service levels (and IBM's request for a further OCI analysis), a reasonably prudent contracting officer would re-examine his/her OCI analysis to make sure that, at a minimum, there were no other instances of unequal access to information.[14]  The Court, therefore, determines that the appropriate injunctive relief is to enjoin the agency from awarding the ITSM contract until it conducts further OCI analysis.  Consequently, an injunction to exclude Jacobs from the reprocurement as IBM requests is not warranted.

### 1.    A Contracting Officer Has Ongoing Responsibility to Identify and Evaluate OCIs.

A contracting officer is responsible for ensuring the integrity of the procurement system.  FAR 1.102-2(c)(1).  As part of that responsibility, the contracting officer must analyze each

---

[14]   An OCI is not limited to unequal access to information conferring an unfair competitive advantage.  *See, e.g., Turner Constr. Co. v. United States*, 94 Fed. Cl. 561, 568-69 (2010), aff'd, 2011 WL 2714137 (Fed. Cir. July 14, 2011).

procurement to determine if there are any potential or actual OCIs.  In this case, IBM alleges two types of OCIs: (1) unequal access to information and (2) biased ground rules.  An unequal access to information OCI may arise in situations where an offeror, by virtue of its performance on a government contract, obtains access to non-public information that other offerors do not have, which provides it an unfair competitive advantage on a new procurement.  *Turner Constr.*, 94 Fed. Cl. at 569; FAR 9.504, 905(b).  A "biased ground rules" OCI may occur in situations where an offeror, as part of its performance of a government contract, has provided input to the statement of work or specifications of an RFP in such a way as to provide the firm a competitive advantage in responding to the RFP.  *Turner Constr.*, 94 Fed. Cl. at 569; FAR 9.505-2.  Whether a potential conflict may exist depends on the particular facts and circumstances of the contract being performed and on the nature of the new procurement.  *See PAI Corp. v. United States*, 614 F.3d 1347, 1352-53 (Fed. Cir. 2010).

Under the procedures set forth in the federal regulations, a contracting officer must identify and evaluate any potential OCIs as early in the acquisition process as possible.  FAR 9.504(a).  Indeed, the contracting officer has an ongoing responsibility to identify and evaluate potential OCIs.  *See* Oral Argument Tr. 8:7 – 9:11, June 27, 2011.  If potential OCIs are identified, the contracting officer must determine if they are significant.  FAR 9.504(a).  For significant OCIs, the contracting officer must document the analysis and submit a recommendation for corrective action to the head of the contracting agency.  FAR 9.506(b).  The head of the contracting agency will determine the appropriate action based on the contracting officer's recommendation, FAR 9.506(c), and may decide to disqualify a government contractor if significant OCIs cannot be mitigated; the contracting agency also has the authority to waive the requirements set forth in the OCI regulations, FAR 9.503.

In sum, the contracting officer is required to evaluate any potential OCIs as early in the procurement as possible (and during the procurement) and should consider the particular circumstances that give rise to the potential OCI.  Only significant OCIs need to be documented and mitigated.

### 2.     The GAO's Decision Regarding IBM's OCI Allegations Pertaining to the Initial Procurement

IBM's two allegations pertaining to potential OCIs in the initial procurement—(1) that Jacobs' knowledge of service desk user levels created an OCI and (2) that USSOCOM's OCI analysis and measures were inadequate—were addressed by the GAO.  With regard to IBM's first allegation, the parties disagree as to whether the GAO determined that Jacobs had an OCI associated with its knowledge of service desk user information. As explained below, the Court concludes that the GAO's determination is effectively a finding that an unequal access to information OCI existed.  Although the GAO did not label the service desk user level issue as an OCI, the GAO's decision and its comments would compel a reasonable person to make the connection between the description of the flaw in the initial procurement and an OCI.

a.   Jacobs' Knowledge of Service Desk User Information Was Effectively an OCI.

With regard to the issue of service desk user levels, IBM alleged in its bid protest before the GAO that the cost/price evaluation was unfair because (1) the information on the number of service desk users in the RFP was misleading and (2) Jacobs had an OCI —an unfair competitive advantage arising from its access to information on the number of gold and silver users that was the basis for the agency's cost evaluation.  IBM argued that the agency knew of Jacobs' OCI (as a result of Jacobs' disclosure in its proposal) and failed to mitigate the conflict, and therefore, that the initial award should be set aside and Jacobs should be excluded from the procurement.

The GAO sustained IBM's bid protest, finding (1) "that the RFP did not reasonably provide offerors adequate information to compete on a relatively equal basis" and (2) that "Jacobs apparently had information not possessed by the other offerors that enabled it to prepare its proposal on a materially different basis."  AR 33848.  The GAO stated that it "appears that Jacobs likely was aware that the agency would not use the relative proportions of users at each service level as indicated in section B of the RFP in its evaluation of prices for this aspect of the requirement."  AR 33849-50.  Additionally, the GAO stated:  "[I]t appears that Jacobs may have had insight to the agency's actual requirements (which provided the basis for the agency's actual evaluation approach), [and] it was fundamentally unfair for the agency not also to have provided the same information to the other offerors, so that the competition would be conducted on a relatively equal basis."  AR 33850.

The GAO recommended that the agency provide all offerors the number of users that the agency intended to use to evaluate proposals and allow all offerors to resubmit proposals.  AR 33853.  The GAO also noted that if the agency implemented this recommendation, then any alleged OCI allegation pertaining to service desk users would be mitigated.  AR 33851.

An examination of the GAO's discussion of the desk service level issue supports the conclusion that the GAO effectively had found an unequal access to information OCI despite its failure to clearly label it as such.  The GAO found that Jacobs was aware of or had insight into the historical number of users that other offerors did not have, which provided the basis for the agency's evaluation of offerors' prices. The GAO also concluded that as a result of having this insight, Jacobs was able to compete "on a materially different basis," and that it was "unfair" that Jacobs apparently had information that others did not.  Significantly, the GAO included mention of the service desk user issue under the "OCI" heading in its opinion, noting that if the agency implemented the GAO's recommendation to provide the information to all offerors, then any alleged unequal access OCI pertaining to this information would be "neutralized."

b.   USSOCOM's OCI Analysis Regarding the ALMBOS, GBPS, and EITC Contracts

IBM also alleged that USSOCOM failed to conduct a proper OCI analysis in connection with Jacobs' performance under the ALMBOS, GBPS, and EITC contracts.  IBM pointed to the alleged actual OCI arising from Jacobs' knowledge of gold and silver users and to alleged inadequacies in the agency's OCI analysis and mitigation efforts in the initial procurement.

The GAO, however, determined that the OCI analysis for the initial procurement was extensive and that IBM failed to show how USSOCOM's efforts were inadequate.[15]   The GAO's overall conclusion was that it had no basis to question the Contracting Officer's decision not to exclude Jacobs from the initial procurement on OCI grounds.  AR 33851-52.

### 3.   USSOCOM's Decision Not to Pursue Further OCI Analysis Was Arbitrary and Capricious.

The Court determines that USSOCOM's decision not to conduct further OCI analysis lacked a rational basis, and therefore, was arbitrary and capricious.  First, as stated above, the GAO's decision reasonably raised the concern for potential OCIs arising from Jacobs' knowledge or insight into information that might be competitively useful.  Second, a contracting officer has ongoing responsibility to identify and evaluate OCIs and to ensure the integrity of the procurement system.  Thus, a reasonable person with responsibility for the integrity of the procurement, when confronted with the problems that arose with the number of service desk users, would have conducted further evaluation and analysis to determine if any potential OCIs existed for the reprocurement.  Third, although the Defendant noted that it could still perform an OCI analysis prior to contract award, the Contracting Officer is required to evaluate any potential OCI as early in the reprocurement as possible.  In this regard, it would have been reasonable to conduct the analysis following the release of the GAO decision (which was February 23, 2011) rather than defer the OCI analysis until later in the reprocurement process.

USSOCOM appears to believe that no further OCI analysis is required in light of the GAO's findings and conclusions.  It seems to the Court, however, that the agency may not fully appreciate the nature of the problem with the number of service desk users, and therefore, the nature of any potential OCI that might exist in the reprocurement.  In the initial procurement, Jacobs did not have direct access to information that was used in the agency's evaluation of proposals.  Even so, the GAO found that Jacobs had relevant knowledge and insight into information that allowed it to compete on a materially different basis.  This would be enough, it seems, to cause a reasonably prudent contracting officer to use the opportunity provided by a reprocurement to review Jacobs' access to agency information to identify any potential OCIs.  It does not seem that simply determining that Jacobs does not have direct access to non-public information, or that the agency has implemented efforts to prevent or restrict access to information, would be sufficient in light of the GAO's findings.

The Court, therefore, determines that, at a minimum, USSOCOM should conduct further OCI analysis to identify and evaluate any potential OCIs prior to contract award regarding all offerors.  In order to discourage future challenges to the adequacy of the OCI analysis, the Court strongly recommends that the analysis be documented.  Specifically, it would be prudent for the agency to, inter alia, (1) determine and document whether Jacobs had other knowledge or insight

---

[15]  The Court has already indicated that this conclusion is puzzling considering the GAO's findings and conclusion on the service desk user information.  The Court also notes that the OCI issue before the GAO is different from the OCI issue before this Court.  The GAO was only concerned with OCIs in the initial procurement.  The issue before this Court is whether, *in light of the whole GAO decision and the allegations of IBM*, whether further OCI analysis is required.

as an incumbent contractor that could be competitively useful in the procurement, (2) determine whether any potential OCIs identified are significant requiring further action pursuant to federal regulations, and (3) keep a log of the steps it took in conducting the analysis.

Implicit in the Court's decision to require the agency to conduct further OCI analysis is the refusal of the Court to determine on its own whether other OCIs exist such that Jacobs should be excluded from the reprocurement. The determination of whether an OCI exists is committed to the agency in the first instance.  Pursuant to FAR 9.504(a), "contracting officers shall analyze planned acquisitions in order to…[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible."   Once the agency has conducted its OCI analysis, the Court may be called upon to review the analysis to determine whether it was adequate and whether the conclusion of the agency based on the analysis was rational.  For example, the Court has examined the rationality of the GAO's review of the agency's OCI analysis in the initial procurement.  The Court, however, is unaware of any cases that would permit the Court (or any other party, for that matter) to conduct its own OCI analysis and come to its own conclusion in the absence of agency action, as is the case here.

### 4.      IBM Has Been Prejudiced.

Having determined that the agency's failure to conduct further OCI analysis was arbitrary and capricious, the Court must determine whether IBM was prejudiced by that error before granting injunctive relief.  *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed. Cir. 2005).  For prejudice in this pre-award bid protest, the Court weighs whether IBM has demonstrated a "non-trivial competitive injury which can be addressed by judicial relief."  *See Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1362 (Fed. Cir. 2009).

In this case, USSOCOM's failure to conduct additional OCI analysis prejudices IBM. Until the agency conducts additional OCI analysis, IBM is not assured that it is competing on a level playing field.  An OCI by its nature inflicts a non-trivial competitive injury on the other offerors.  Furthermore, if USSOCOM identifies an OCI involving Jacobs in the reprocurement, the agency would presumably either (1) exclude Jacobs from the reprocurement or (2) mitigate the OCI by providing the competitively useful information to all offerors so that they may compete on a fair and equal basis.  Under either scenario, the agency mitigates any potential or actual OCI, and IBM is able to compete on a level playing field without having an unfair competitive disadvantage.  Thus, the non-trivial competitive injury to IBM can be addressed by requiring the agency to conduct further OCI analysis.

The Court, therefore, determines that IBM has satisfied the prejudice requirement, a predicate for injunctive relief.

### 5.      Injunctive Relief is Warranted.

For injunctive relief, a plaintiff must establish (1) that it has succeeded on the merits, (2) that it will suffer irreparable harm if the court withholds injunctive relief, (3) that the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) that it is in the public interest to grant injunctive relief.  *Centech*, 554 F.3d at 1037.  Here, the parties addressed

in their briefs whether the injunctive relief requested by IBM— directing USSOCOM to exclude Jacobs from the reprocurement for violation of PIA and appearance of impropriety—was warranted.  The Court, however, determines that a more limited injunction is warranted —an injunction against awarding a contract until the agency conducts further OCI analysis.

In this case, injunctive relief is warranted.  First, as discussed above, IBM has succeeded on the merits as the Court determined that the agency's failure to conduct further OCI analysis was arbitrary and capricious.  Second, if the Court does not grant injunctive relief, and the agency proceeds without conducting further OCI analysis, IBM will suffer irreparable harm because the agency would have failed to ensure a fair and competitive procurement.  Third, requiring the agency to conduct further OCI analysis, consistent with the responsibilities set forth in FAR 9.500, does not create an undue hardship, particularly because failure to do so would likely be a violation of the regulations.  And finally, the public interest is clearly served by maintaining the integrity of the procurement system.

**B.      Investigation Into Potential Procurement Integrity Act Violation**

IBM also alleges that USSOCOM's failure to investigate a violation of the Procurement Integrity Act ("PIA" or "the Act") was arbitrary and capricious and in violation of law in light of the GAO's decision and IBM's notification to the agency of a possible violation by Jacobs.  IBM's Br. Mot. JAR 27.  Indeed, IBM requests that the Court find that Jacobs violated the PIA and grant IBM injunctive relief excluding Jacobs from the reprocurement.  *Id.* at 50.  Similar to its arguments on OCI issues, IBM's arguments pertaining to a possible PIA violation relate to Jacobs' alleged knowledge of the number of service desk users that were the basis for the agency's evaluation of costs.  The Defendant and Jacobs argue that that there is no evidence of a possible PIA violation, and, therefore, no action is required by USSOCOM.

As explained below, the Court concludes that USSOCOM's failure to pursue a possible PIA violation by Jacobs was not arbitrary and capricious or in violation of law.  Specifically, the Court notes the differences between an allegation of an OCI and an allegation of a PIA violation, and concludes that USSOCOM acted rationally in not initiating a PIA investigation based on IBM's allegations that the flaws in the initial procurement could reasonably be the result of a possible PIA violation.

**1.      A Procurement Integrity Act Violation**

The Procurement Integrity Act, 41 U.S.C. § 423 (2006), in relevant part, provides that a person may not knowingly obtain non-public information that an agency prepared for the purpose of evaluating offerors' proposals in a competitive procurement.  41 U.S.C. § 423(b), (f)(2).

Federal regulations implementing the PIA require that "a contracting officer who has received information of a violation or possible violation" determine if there is "any impact on the pending award or selection of the contractor."  FAR 3.104-7(a).  If the contracting officer determines that the violation does not have an impact on the pending award, the contracting officer must forward the information and documentation to an appropriate designated authority

for concurrence.  *Id.*  If the designated authority does not concur, then the information must be forwarded to the Head of the Contracting Authority ("HCA").  FAR 3.104-7(a), (b).  The HCA determines, inter alia, whether the procurement should be continued, whether an investigation is required, or whether a violation has occurred.  FAR 3.104-7(b).  If there is a PIA violation, the HCA may direct the contracting officer to disqualify an offeror.  FAR 3.104-7(d).

An allegation of a possible PIA violation is a serious accusation and carries a different connotation than a potential OCI.  For an OCI, a government contractor, by virtue of its contracts with an agency, may be accused of having access to or knowledge of information that gives it a competitive advantage on a new procurement.  In comparison, a possible PIA violation requires the offeror to have *knowingly obtained* information that the agency intended to use in evaluating proposals on the new procurement.  Thus, a PIA violation essentially requires an affirmative act by the offeror to obtain source selection information; simply having knowledge is not enough to support a possible PIA violation.  A PIA violation also appears to be founded on improper or unlawful conduct.[16]  Indeed, an offeror who knowingly obtains information for purposes of achieving a competitive advantage in violation of the PIA may be subject to criminal penalties (i.e., imprisonment or fines) in addition to civil penalties and administrative actions.  41 U.S.C. § 423(e).

**2.  The GAO Did Not Determine That There Was a Possible PIA Violation.**

During the bid protest before the GAO, IBM first alleged that Jacobs violated the PIA in its response to USSOCOM's report, which was filed in response to IBM's initial filing with the GAO.[17]  IBM stated that "Jacobs' possession of the knowledge of the evaluation quantities or at least the very low range of the evaluated quantities, constituted a violation of the Procurement Integrity Act, requiring Jacobs' exclusion from the procurement."  AR 33593.

Although the GAO did not discuss IBM's allegations of a PIA violation or make any reference to the PIA or any possible violation in its decision, the GAO stated that it "carefully considered all of IBM's contentions."  AR 33843.  Without more, the Court does not infer any specific conclusions by GAO with regard to a PIA violation.  In contrast, the GAO specifically discussed the issue of OCIs and made several findings and conclusions pertaining to Jacobs' access to information and knowledge of service desk user requirements.  The GAO, however, did not conclude or suggest that Jacobs may have acquired this knowledge by improper or unlawful conduct in violation of the PIA.

---

[16]   GAO also makes this distinction.  In *Health Net Federal Services, LLC*, B-401652.3, B-401652.5, 2009 WL 3843162 (Comp. Gen. Nov. 4, 2009), GAO distinguishes an allegation of an unfair competitive advantage as result of an individual having inside information (e.g., an OCI) from an allegation of a violation of the PIA.  *Id.* at 25.  GAO notes that the essence of the difference is that the provisions of the PIA focus on prohibited actions.  *Id.*

[17]   IBM first alleged a PIA violation during the bid protest before GAO in its "Comments on Agency Report/Supplemental Bid Protest."  AR 33592-93.

### 3.     The Parties' Arguments

Before this Court, IBM contends that Jacobs violated the PIA because it allegedly obtained source selection information—the evaluation quantities for gold and silver user levels. IBM specifically argues that it is evident from Jacobs' pricing that it knew that the maximum quantities in the RFP would not be used in the agency's evaluation, and thus violated the PIA. IBM notes that the GAO reached the same conclusion that Jacobs had this knowledge, citing to the GAO's decision that "Jacobs likely was aware that the agency would not use the relative proportions of users" of the RFP maximum quantities in its evaluation of prices.  IBM's Br. Mot. JAR 20-24.

IBM contends that it has presented "a wide array of circumstantial evidence" that in the aggregate support the conclusion that Jacobs "knew the assumptions underlying the agency's pricing evaluation of service desk services."  IBM's Resp. & Reply 12.  According to IBM, this evidence is sufficient to support a determination that Jacobs violated the PIA.[18]

The Defendant argues that IBM's allegations of an actual PIA violation are mere "suspicion and innuendo" and are unsupported by the administrative record.  Def.'s Resp. & Cross-Motion 45.  Additionally, the Defendant contends that a PIA violation is impossible because the evaluation quantities were determined after proposals were submitted.  *Id.*  The Defendant further explains that Jacobs disclosed the estimated quantities it assumed for its pricing;[19] that Jacobs appropriately relied on its experience, including its experience as an incumbent EITC contractor, in determining estimated quantities of gold and silver users; and that it was rational for Jacobs not to assume that the maximum quantities in Schedule B of the RFP would be the basis for the evaluation quantities.  Thus, the Defendant concluded that a PIA violation was in fact impossible.  Def.'s Resp. & Cross-Motion 52.

Jacobs raises many of the same arguments as the Defendant.  Jacobs contends that the agency did not receive information on a possible violation because Jacobs did not "knowingly obtain . . .source selection information." Jacobs' Resp. & Cross-Motion 25 (citing 41 U.S.C. § 423(b)).  Therefore, according to Jacobs, no action was required by USSOCOM.

---

[18] In IBM's other arguments pertaining to PIA violations, IBM contends that adverse inference should be drawn from Jacobs' alleged "blatant refusal to produce obviously relevant documents" in response to GAO's request. IBM's Br. Mot. JAR 24.  In response, Jacobs avers that it responded to most of the requests and did not act in bad faith when it decided not to produce certain documents. Jacobs' Reply 8.  The Court, however, does not need to address this issue because the issue before the Court is not whether a PIA occurred, but whether the agency's decision not to conduct an investigation was rational.  Furthermore, GAO did not make any adverse inferences in its decision with regard to the discovery request.

[19] Jacobs stated in its proposal the basis for its pricing:

[***].

AR 2905-06.

### 4. USSOCOM's Decision Not to Pursue a Possible PIA Violation Was Not Arbitrary and Capricious.

The Defendant and Jacobs conclude that there was not a possible PIA violation, and therefore, further action was not required. The Court finds these parties' arguments persuasive, and therefore, that the agency's decision not to pursue further analysis was rational, and therefore, not arbitrary and capricious.

The question here is whether the agency acted rationally in not pursuing the procedures set forth in FAR 3.104-7(a) when confronted with IBM's allegation of a PIA violation. On this issue, the Court finds instructive the GAO's decision in *Accent Service Co.*, B-299888, 2007 WL 2694406 (Comp. Gen. Sept. 14, 2007).[20] In *Accent*, Accent Service Company ("Accent") submitted a complaint to the Department of the Navy ("Navy") alleging that specific conduct by agency employees constituted a violation of procurement integrity. *Id.* at 2. The GAO stated that "the contracting officer (CO) for [the] procurement, as well as a second CO and Navy legal counsel reviewed the allegations" and concluded that there was no violation. *Id.* Specifically, the Navy determined that there was no improper conduct and that the information at issue did not constitute prohibited information as defined in federal statutes and regulations. *Id.* at 3. The Navy responded to Accent's complaint indicating "'that the competitive integrity of the procurement processes has not been compromised and that the information exchanged will not provide any advantage' to any competitor." *Id.* at 2. The GAO concluded that "the Navy's response to the protester's allegations was reasonable, and consistent with its statutory and regulatory obligations." *Id.* at 4. Thus, if the GAO or a court determines that the contracting officer's assessment that there was no PIA violation was rational, then the agency's decision not to pursue procedures under FAR 3.104-7(a) would be deemed reasonable.

As stated above, this Court determines that the Defendant's conclusion that there was no possible PIA violation was rational. Overall, it was not irrational to conclude from the GAO's decision and the facts in this case that Jacobs had not engaged in improper conduct in violation of the PIA. The record shows that Jacobs, as an incumbent subcontractor on the EITC contract, lawfully had knowledge of historical information that enabled it to estimate the number of gold and silver service desk users in preparing its cost proposal. Indeed, Jacobs disclosed these assumptions in its proposal. In addition, although Jacobs apparently knew not to use the maximum numbers in Schedule B of the RFP (as the GAO concluded), this knowledge was reasonably the result of its understanding of the RFP combined with its knowledge gained through its EITC experience. As the Court discussed previously, Jacobs' knowledge of service desk user information, which also formed the basis for USSOCOM's evaluation approach, was effectively an OCI. Simply having this knowledge, however, without more (e.g., likely improper or unlawful conduct) does not necessarily suggest a possible PIA violation. Furthermore, the Contracting Officer explained the development of the numbers to be used for evaluation purposes, stating that the quantities of gold and service desk users were determined after the

---

[20] This Court is not bound by GAO's decisions but gives deference to GAO as an independent expert tribunal, recognizing GAO's experience with issues such as PIA violations and OCIs.

offerors submitted their proposals.[21]  AR 64-65.  Thus, from the agency's perspective a PIA violation was not possible.

Thus, the Court determines that the agency's response to IBM's allegations that a PIA violation was not possible was reasonable, and therefore, that USSOCOM's decision not to conduct a PIA investigation in the reprocurement was not arbitrary and capricious or a violation of law.

Similar to the OCI issue, implicit in the Court's review is the Court's refusal to determine on its own whether Jacobs acted unlawfully or improperly in violation of the PIA and as a result should be excluded from the reprocurement.  It is not the Court's role to conduct an independent PIA analysis, and here, it makes no sense to do so, as the Court has concluded that a PIA investigation by the agency is not compelled.  As previously stated with regard to OCIs, the Court is unaware of any cases that would permit the Court, or a party, to conduct its own investigation and make its own determination of whether there was a PIA violation in the absence of agency action.

## C.     The Appearance of Impropriety

IBM argues that even if the Court cannot conclusively determine that there was a PIA violation, Jacobs should still be disqualified from the reprocurement because the "case presents a serious appearance of impropriety."  IBM Resp. & Reply 5.  IBM contends that there is at least an appearance of impropriety because Jacobs "somehow obtained specific non-public source selection information about the pricing evaluation."   IBM's Br. Mot. JAR 35.  The Court concludes, however, that there are no hard facts to support the appearance of impropriety.  In addition, any alleged appearance of impropriety based on Jacobs' unequal access to information is remedied by the Court's decision above that USSOCOM must conduct additional OCI analysis before making a contract award.

### 1.     Decisions to Disqualify Offerors on the Basis of an Appearance of Impropriety

A contracting officer is obligated to protect the integrity of the procurement system and to avoid even the appearance of an impropriety.  *See* FAR 3.101-1.  A contracting officer has broad discretion to fulfill these obligations.  As the Federal Circuit has held, a contracting officer is authorized to disqualify an offeror for even an appearance of impropriety to ensure the integrity of the procurement process.  *NFK Eng'g v. United States*, 805 F.2d 372, 377 (Fed. Cir. 1986).

In this case, however, a contracting officer has not addressed the issue; that is, there is no determination on the part of a contracting officer that there is or is not an appearance of impropriety.  Therefore, IBM is asking the Court to make the determination on its own that an

---

[21]  IBM contends that the agency decided the gold and silver users prior to the receipt of proposals. The Court, however, presumes the Contracting Officer acted in good faith in making his declarations.  As previously discussed, the Contracting Officer's statements are contemporaneous evidence for purposes of the reprocurement.

appearance of impropriety exists such that Jacobs should be excluded from the reprocurement.

The Court is aware of only one case in the Court of Federal Claims in which the court found an appearance of impropriety in the absence of a prior determination by a contracting officer, namely, *CACI, Inc.-Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983). The Federal Circuit, however, overturned the Court of Federal Claims decision to enjoin the award to the contractor because there must be "hard facts" to support the appearance of impropriety, and the court's "inferences of actual or potential wrongdoing" were based on "suspicion and innuendo." *Id.* at 1583. The Federal Circuit noted that, although the Court of Federal Claims has broad authority to enjoin an agency from awarding a contract to an offeror, 28 U.S.C. § 1491(b)(2), it should exercise that authority "only in extremely limited circumstances." *Id.* at 1581.

*NFK Engineering* in the Federal Circuit and *Compliance Corp. v. United States*, 22 Cl. Ct. 193, 205 (1990), *aff'd*, 960 F.2d 157 (Fed. Cir. 1992) (unpublished opinion), although involving prior determinations by a contracting officer, give some insight into the circumstances in which a determination of an appearance of impropriety is warranted.

In *NFK Engineering*, the agency identified a possible conflict of interest when NFK submitted a best and final offer that represented a 33% decline in price from its prior offer. The agency believed that this was probably a result of "inside" information, because NFK had recently hired the contracting officer's technical representative for that solicitation. 805 F.2d at 373. The agency "concluded that this appearance of and potential for an unfair competitive advantage so tainted the procurement process that the integrity of the process had been damaged." *Id.* at 375. As a result, the agency disqualified NFK from the solicitation and the Federal Circuit upheld the agency's decision.

The Court of Federal Claims in *Compliance Corp.* held that the contracting officer had authority to disqualify a bidder "based solely on the appearance of impropriety when, in his honest judgment, it is necessary to do so to protect the integrity of the procurement process." *Compliance*, 22 Cl. Ct. at 205. The contracting officer received a complaint alleging that one competitor attempted to obtain information regarding another competitor's proposal and, therefore, requested an investigation of the allegations. Based on the results of the investigation that showed that the bidder had obtained, or had attempted to obtain, proprietary proposal information, the contracting officer disqualified the bidder. *Id.* at 199. The court upheld the agency's decision.

## 2.   IBM Has Not Established an Appearance of Impropriety.

IBM asserts that it has provided evidence that it believes supports a PIA violation, or at a minimum, demonstrates an appearance of impropriety. IBM believes that "GAO, an unbiased observer, found that it was 'likely' that Jacobs had acquired knowledge of the Gold and Silver user levels to be used in the evaluation." IBM Br. Mot. JAR 34. IBM contends that "likely" is enough for an appearance of impropriety, and that it is based on "hard facts." For example, IBM points to the facts that led the GAO to its findings related to gold and silver service levels. IBM suggests that, as a result of Jacobs' contract to provide support to USSOCOM's procurement office, there are various circumstances that jeopardize the integrity of the procurement process

(e.g., alleged access to offices, participation in meetings, and roles in development and maintenance of databases and websites).  According to IBM, "somehow [Jacobs] obtained specific non-public source selection information about the pricing evaluation."  *Id.* at 35.  And finally, IBM suggests that the Court should consider, in finding an appearance of impropriety, IBM's contention that Jacobs allegedly refused to produce documents requested by the GAO.

In this case, IBM's conjectures do not rise to the level of the facts in *NFK Engineering* and *Compliance Corp.*  There are no "hard facts" that Jacobs acted in a manner that would raise concerns about the integrity of the procurement system.  The GAO's statement that it was "likely" that Jacobs had acquired knowledge of the gold and silver user levels to be used in the evaluation does not necessarily indicate that it improperly obtained that knowledge, as the Court has explained in the context of the PIA issue.  Furthermore, the Court does not find sufficient facts in addition to a numerical anomaly in the bid, that is, facts analogous to those in *NFK Engineering* and in *Compliance Corp.*, that qualify as "hard facts."  In *NFK Engineering*, in addition to the decline in NFK's prior offer price, NFK had recently hired the contracting officer's technical representative for that solicitation.  In *Compliance Corp.*, the contracting officer had received results of an investigation that indicated improper conduct by one of the competitors.

In sum, IBM has not alleged sufficiently "hard" facts that persuade the Court that there is an appearance of impropriety at all, let alone one that would call for the exclusion of Jacobs from the reprocurement.

## D.      Demonstrated Historical Capacity: USSOCOM's Decision to Revise the Technical/Management Evaluation Approach

IBM contends that the agency's decision to modify the technical/management evaluation approach for the reprocurement pertaining to "demonstrated historical capability" was arbitrary and capricious.  IBM seeks declaratory judgment to this effect and an injunction requiring the agency to evaluate the reprocurement on the basis of the technical/management evaluation approach set forth in the initial procurement.

As explained below, the agency's decision had a rational basis, and therefore was not arbitrary and capricious.

### 1.      USSOCOM's Solicitation – Technical/Management Evaluation Approach

The agency's technical/management evaluation considers the offeror's overall approach and expressed capabilities for providing information technology services, as well as its ability to manage the day-to-day operations delivery and support the information technology services environment for each service area.  AR 795.  In the initial procurement, the RFP further stated that the technical/management evaluation will "focus on the strengths, weaknesses, and risks of the Offeror's proposal, *as well as demonstrated historical capability of engagements of similar size and complexity.*"  *Id.* (emphasis added).

As part of the reprocurement, the agency decided to modify the stated "focus" on "demonstrated historical capability of engagements of similar size and complexity."[22]  In the revised RFP, the agency made the consideration of demonstrated historical capability optional.  In relevant part, the revised language for the technical/management evaluation approach states:

> Evaluation of this factor shall focus on the strengths, weaknesses, and risks of the Offeror's proposal.  Demonstrated historical capability of engagements of similar size and complexity, if provided as part of a proposal, may be considered by the [agency] when assessing the adequacy of the approach and/or the risk on successful performance.  Offerors need not demonstrate historical capability in order to receive any particular rating or risk level, however.

AR 33497.

### 2. USSOCOM's Decision to Revise the RFP Was Not Arbitrary and Capricious.

IBM argues that USSOCOM's decision to revise the "demonstrated historical capability" language in the technical/management evaluation approach was arbitrary and capricious primarily because (1) the GAO did not recommend a revision, (2) the agency provided no rational explanation, and (3) the agency is merely attempting to steer the award to Jacobs.  IBM's Br. Mot. 39-40.  The Court, however, determines that USSOCOM's decision to revise the RFP was not arbitrary and capricious.

First, the agency has broad discretion in the procurement process, including in its decisions to amend a solicitation.  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Although the GAO made specific recommendations for amending the solicitation, which did not include revisions to the technical/management evaluation, the agency has discretion to make other changes to the solicitation.  Furthermore, contracting officers are given substantial discretion in the evaluation of offerors' proposals.  *R & W Flammann GmbH v. United States,* 339 F.3d 1320, 1322 (Fed. Cir. 2003); *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 735 (2007) (citing *E.W. Bliss Co.*, 77 F.3d at 449) ("Agency technical evaluations, in particular, should be afforded a greater deference by the reviewing court.").  Thus, the fact that the GAO did not recommend a revision to the technical/management evaluation has no bearing on the rationality of the agency's decision.

Second, the Defendant's explanation had a rational basis.  In judging the rationality of USSOCOM's decision to modify the technical/management evaluation approach, a highly deferential standard is appropriate.  Under a "highly deferential" rational basis review, the

---

[22] IBM also alleges that the agency failed to meaningfully evaluate demonstrated historical capability in the initial procurement.  The Defendant and Jacobs dispute IBM's claim.  GAO did not address this issue.  Because this Court denied Jacobs' request to reinstate the initial procurement, *Jacobs Technology Inc. v. United States*,  2011 WL 2516416 (Fed. Cl. June 8, 2011), IBM's issues with regard to the initial procurement are moot, and this Court addresses only the issue raised pertaining to the reprocurement.

agency's decision is rational if it "evinces rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir.2000).

The Defendant explained that the agency amended the "demonstrated historical capability" language in order to clarify the agency's requirements and method for evaluating proposals." Def.'s Resp. & Cross-Motion 76. The Defendant noted that "demonstrated historical capability" was not a factor or subfactor with a separate evaluation and rating, and that IBM's bid protest highlighted that offerors may have been confused as to how the agency intended to use demonstrated historical capability in the overall technical/management evaluation. USSOCOM explained to offerors that it revised the RFP so that offerors could refine their proposals to provide more detailed information about their approach to meeting the contract requirements, rather than focus too much on past accomplishments. USSOCOM also stated that "by requiring offerors to provide more details on their technical approaches, the agency will ensure it will obtain the best possible value in the procurement." Def.'s Reply 16-17. IBM disputes whether the agency's changes to the language in the RFP will do anything "to ensure that the best value is selected in this procurement." IBM's Resp. & Reply 32. The Court, however, concludes that the amendment is not irrational or unreasonable. In addition, if a court finds the agency's action had a rational basis, it should not substitute its judgment for that of the agency. *Advanced Data Concepts*, 216 F.3d at 1058.

Finally, with regard to whether the agency's amendment steers the award to Jacobs, the Court appreciates IBM's concern, but must presume that the agency acts in good faith. IBM does not point to anything in the administrative record that demonstrates the intent of the agency to steer the award to Jacobs.[23]

According to the Defendant, the agency's amendment does not steer the award to Jacobs. The Defendant contends that the amendment has a neutral affect on the offerors. In fact, the Defendant argues that the amendment actually helps all offerors, including IBM, by clarifying the relative importance of demonstrated historical capability when compared to other (more important) aspects of an offeror's technical/management approach. Def.'s Reply 16-17.

In sum, the Court determines that USSOCOM's decision to revise the RFP with regard to "demonstrated historical capability" in the technical/management evaluation approach was not arbitrary and capricious.

---

[23]   IBM contends that, if USSOCOM had considered "demonstrated historical capability" as IBM believes the agency should have in the initial procurement, the agency would have rated [***]. IBM believed that "demonstrated historical capability" would be specifically considered in the evaluation because the RFP noted that the agency's focus in evaluating each of the subfactors would include, inter alia, consideration of this capability. The agency, however, did not, nor did it have to, disclose how this capability would be factored into the evaluation of each of the subfactors, or the weight it would carry. The fact that IBM expected a more meaningful, and perhaps more prominent, consideration is not enough to withstand the considerable deference accorded the agency in evaluating the proposals.

### E.      USSOCOM's Decision Not to Re-Evaluate Past Performance

IBM contends that the agency's decision not to re-evaluate Jacobs' past performance as part of the reprocurement was arbitrary and capricious.  IBM seeks declaratory judgment to this effect, and an injunction requiring the agency to re-evaluate Jacobs' past performance as part of the reprocurement.

As explained below, the Court concludes that the agency's initial evaluation of Jacobs was reasonable, and therefore, the agency's decision not to conduct a new evaluation as part of the reprocurement was not arbitrary and capricious.

### 1.      Past Performance Evaluation Scheme

For the past performance rating, the agency determined an overall level of confidence in the offeror's ability to successfully perform the required effort.  The agency determined whether it had high confidence, satisfactory confidence, limited confidence, or unknown confidence in the offeror's ability.  The confidence rating was based on the offeror's performance evaluations for current and relevant present and past performance, which the agency assigned ratings of exceptional, very good, satisfactory, or unsatisfactory performance.

### 2.      USSOCOM's Past Performance Evaluation of Jacobs

As part of the initial procurement, USSOCOM assigned Jacobs a past performance rating of high confidence.[24]  The assessment was based on evaluations of Jacobs' past and present performance on work performed on five contracts.  [***].  Thus, the agency concluded that it had high confidence that Jacobs would successfully perform the work under the ITSM contract.  AR 4380.

IBM alleged in its bid protest before the GAO that the agency acted unreasonably in awarding Jacobs the highest possible past performance rating of high confidence.  IBM specifically claimed that it was unreasonable to assign [***] rating for Jacobs' performance on [***].  IBM argued that Jacobs' rating on [***] contract was not consistent with the agency's definition of [***] performance.[25]  The GAO did not address IBM's allegations regarding USSOCOM's past performance rating for Jacobs.

---

[24] "High Confidence" is defined as:  "Based on the offeror's performance record, the government has a high expectation that the offeror will successfully perform the required effort."  AR 4373.

[25] The four performance ratings used by the evaluators submitting evaluations and by USSOCOM in its assessment were:

> Exceptional - "Performance meets contractual requirements and exceeds many to the Government's benefit.  The contractual performance of the element or sub-element being assessed was accomplished with few minor problems for which corrective actions taken by the contractor was [*sic*] highly effective.

> Very Good – Performance meets contractual requirements and exceeds some to the Government's benefit. The contractual performance of the element or sub-element being assessed was accomplished with some minor problems for which corrective actions taken by the contractor was [*sic*] effective.

As part of the reprocurement, USSOCOM communicated to offerors that the GAO did not identify any issues with the past performance evaluation, that the agency will not perform a new assessment, and that past performance ratings that were previously determined and debriefed would be used.  IBM claims that the agency's decision not to re-evaluate Jacobs' past performance was irrational because IBM identified flaws in the evaluation of Jacobs' performance during the GAO bid protest, which the GAO did not address.

### 3.    USSOCOM's Decision Not to Re-evaluate Past Performance for the Reprocurement Was Not Arbitrary and Capricious.

The Court concludes that the agency's assessment of [***] for Jacobs' performance on [***] was reasonable, and therefore, the decision not to re-evaluate past performance for the reprocurement was not arbitrary and capricious.

IBM alleges that the agency's assessment of Jacobs on [***] was irrational in light of a "side note" made by [***] contracting officer (the evaluator).  In a narrative statement of Jacobs' performance, the evaluator first noted:  "[***]."  AR 32471.  Then, as IBM highlights, the evaluator commented:

[***].

*Id.*  The evaluator went on to say that "[***]" and that "[***]."  *Id.*  Even with this situation, the evaluator still concluded that "[***]."  *Id.*  The evaluator also indicated that she had no reservations about soliciting Jacobs in the future or having Jacobs perform one of [***] critical and demanding programs.  *Id.*

USSOCOM in turn rated Jacobs' overall performance on [***] as [***].  IBM argues that the agency was prohibited from assigning Jacobs [***] rating because that rating requires that the work was "[***]."  *See* AR 4372.  IBM points to the evaluator's statements that there was a [***] and that "[***]," which the evaluator noted was because "[***]."  *See* AR 32471.

The Court reviews the agency's performance evaluation decisions under a highly deferential rational basis standard.  Based on this standard, the agency's decision was not arbitrary and capricious.

---

Satisfactory – Performance meets contractual requirements. The contractual performance of the element or sub-element contains some minor problems for which corrective actions taken by the contractor appear or were satisfactory.

Unsatisfactory - Performance does not meet most contractual requirements and recovery is not likely in a timely manner. The contractual performance of the element or sub-element contains a serious problem(s) for which the contractor's corrective actions appear or were ineffective.

AR 4372.

As noted, the record shows that [***], and appeared to have a high confidence in Jacobs' ability to perform, even though she noted "adverse" information.  In addition, it was not unreasonable, based on the nature of the "adverse" information, for the agency to give an overall [***] evaluation of Jacobs' performance on [***].  The issue that arose was a one-time extraordinary circumstance [***], which affected Jacobs' ability to [***] and impaired [***].  The evaluator, however, after describing the circumstances of [***], stated that other than the situation noted, Jacobs "[***]."[26]

Furthermore, the performance rating definitions provide the agency discretion in assigning a rating.  For example, the agency's evaluation scheme distinguishes the top two ratings, exceptional and very good, by whether the offeror "exceeds many" or "exceeds some" of the contractual requirements to the agency's benefit, and whether the work was accomplished with "few minor problems" or "some minor problems" for which corrective actions were "highly effective" or "effective."  AR 4372.  The rating scheme is not so precise as to require the agency to select a particular rating when [***].  The agency's rating need only be reasonable in light of the circumstances.

As noted, it was not unreasonable to determine under the circumstances that a rating [***] was not warranted.  Furthermore, even if the [***] rating for Jacobs on [***] was not rational, it does not necessarily follow, as IBM argues, that the overall assessment of high confidence was irrational.  First, [***].  Second, in light of the extraordinary nature of the one issue that arose during [***], it would not have been unreasonable for the agency to determine that it had high confidence in Jacobs—"a high expectation that the offeror will successfully perform the required effort."

Because USSOCOM's evaluation of Jacobs' performance as [***] under [***] and the agency's overall past performance evaluation of high confidence were rational, the agency's decision not to re-evaluate Jacobs' past performance was not arbitrary and capricious.

V.     **CONCLUSION**

For the reasons set forth above, the Court:

1.  **DENIES** as moot IBM's motion for judgment on the administrative record on the issues related to the initial procurement;

2.  **DENIES** IBM's motion to compel discovery and to supplement the administrative record;

3.  **GRANTS IN PART** and **DENIES IN PART** IBM's motion for judgment on the administrative record on the OCI issues related to the reprocurement and **DENIES IN PART** and **GRANTS IN PART** the Defendant's and Jacobs' cross-motions on these

---

[26] The Contracting Officer also explained the rationale for the agency's rating:  "[***]," and therefore, the evaluation team rated Jacobs' overall performance on [***] as [***].  AR 32936.

issues.  The Court **GRANTS IN PART** IBM's request for a declaratory judgment, declaring that the agency's decision not to conduct additional OCI analysis was arbitrary and capricious.  Accordingly, the Court enjoins the agency from awarding the ITSM contract until the additional OCI analysis is completed.  The Court **DENIES** IBM's request for an injunction precluding Jacobs from competing in the reprocurement on the basis of OCIs; and

4.  **DENIES** IBM's motion for judgment on the administrative record for IBM's remaining claims that the agency's reprocurement decisions were arbitrary and capricious and in violation of law with regard to:  (a) an alleged violation of the Procurement Integrity Act, (b) the agency's revision to the RFP on the technical/management evaluation of proposals, and (c) the agency's decision not to re-evaluate Jacobs' past performance.  The Court **GRANTS** the Defendant's and Jacobs' cross-motions on these claims.

The Court directs the Clerk of the Court to enter judgment accordingly.


                                        s/ Edward J. Damich
                                        EDWARD J. DAMICH
                                        Judge